■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN HUERTAS, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Kern, J.). rendered April 29, 1974, convicting him of attempted robbery in the first degree, assault in the first and second degrees, and possession of weapons and dangerous instruments and applicances, as a felony, upon a jury verdict, and imposing sentence. Judgment affirmed. No opinion. Damiani, J. P., Mangano and Weinstein, JJ., concur.

Lazer, J., dissents and votes to reverse the judgment and order a new trial, with the following memorandum: This record reveals a Trial Judge so convinced of defendant's guilt that he had no patience for the jury's effort to give consideration to the defendant's explanation for his presence at the scene of the crimes charged. One result of the impatience was to deprive the jury of its right to rehear certain testimony; another was a tirade by the court which directly projected to the jury the court's opinion as to guilt. The consequence, of course, was the destruction of defendant's right to a fair trial. The appeal is from convictions which resulted in sentences, the maximum of which was 7½ to 15 years, based on defendant's status as a second felony offender. The case derives from a grocery store robbery allegedly perpetrated by the defendant and a friend named Thomas Kenney. The pair entered the store at 9:30 P.M. and, during the course of their presence, Kenny shot the owner and defendant struck the owner's wife with the shotgun with which he had entered. Defendant's contention at trial was that he had not gone to the store to commit a robbery but to protect the owner from Kenney. According to defendant's story, he met Kenney at 3:30 P.M. and found him extremely angry over an argument he had with the store owner. Defendant saw his friend being incited by another individual to "[G]o get" the owner. Failing in his effort to persuade Kenney not

to go until the next day when he would accompany him there to talk to the owner, defendant went to the store with Kenney to avoid bloodshed. However incredible this explanation may appear when sprung from the printed page, the jury seems to have given it serious consideration during its deliberations, particularly as it affected defendant's intent. The note sent to the court by the jury requested that testimony be reread to show whether the defendant and Kenney were together from 3:30 P.M. to 9:30 P.M. The note also asked, *inter alia*, (1) whether Kenney and the defendant were together all the time, (2) whether defendant carried the weapon from 3:30 P.M. to 9:30 P.M., (3) "Can you also repeat and clarify the part where Kenney said he was going to rip off the store and [defendant] agreed to it. Did he say, oh, lets go *[sic]*"; and (4) whether defendant knew that he was going to aid and abet in the commission of the crime. The court's angry response focused the jury's attention entirely on what occurred in the store at 9:30 P.M. and the message clearly imparted was that the events preceding 9:30 were immaterial. Thus the record shows: "THE COURT: Well, gentlemen of the jury, to say I was surprised to get this note is putting it mildly. I can't understand this note. Let me read this. 'The jurors request testimony on reading back, or reading back part — reading back of the part on whether Huertas or Kenney were together from 3:30 to 9:30 P.M. Were they?' You asked me to answer that question, gentlemen. If I could answer all these questions, I didn't need a jury; we don't need juries then. That's why you're here. You're to answer that question. Then, 'whether they were together all the time or not.' Did you ask yourselves what difference does that make, or maybe you're not interested in what happened in the store at 9:30. I don't know. Maybe, if your not interested, just say so. Whether they were together from 3:30 to 9:30 P.M. I don't know, gentlemen. The testimony was there. You heard it. If we have to read back the whole record of the trial, that's all right with me, gentlemen. I've got no place to go. You'll go to dinner, come back, we'll read it all back, and maybe send you to a hotel tonight, and continue tomorrow morning. It's all right with me, because I've got no place to go, gentlemen, so now this question requesting reading back of whether Huertas and Kenney were together from 3:30 to 9:30 P.M., were they, I decline to answer, gentlemen. I have no way of telling, except from the evidence, and I can't tell you that anyway. I might have one opinion; you might have another opinion. But, whether they were together, again, I say maybe you're not interested in what happened after 9:30, in the store. If you're not, then we'll just let it go at that. But what that has to do with it, I don't know. Now, next question: 'Did Huertas carry the weapon from 3:30 P.M. to 9:30 P.M.?' Again, gentlemen, I don't know. How can I answer that question. You've heard all the testimony. If you want all the testimony read, we'll read it back. Did it make any difference? Does it make any difference? Have you asked yourselves that? The question is, gentlemen, did the defendant go into the store, was he there at all. If he was there, did he have a shotgun, did he have a weapon? Now, 'Can you also repeat and clarify the part where Kenney said he was going to rip off the store, and Huertas agreed to it. Did he say, oh, let's go.' You're asking me, gentlemen? I'm not the jury. Now, the questions were very clear. The defendant Kenney was asked, if you want this read back, you can read it back, you can have it read back, he was asked whether this was true. 'I told him, I said, I'm going in here because I had a brief — you know, I had an argument with this individual before, and that — now, I was going to that place there, where he argued with me, and I am going to take him.' He was asked that question before, and he said, yes, and then he was asked — he was asked this question, 'You are going to take it?' The defendant Kenney; 'Take it off.' He said yes. And I asked him if that's true, and he said yes, that's true. Then he was asked if — he was asked this question, 'Well, taking a place off, means you're going to

stick the place up?' Defendant Kenney: 'Right.' I asked him, did you say that, and he said yes. Is that true? He said yes. That's true. 'Well, what did the defendant Huertas say?' First he said he didn't say anything. Then I asked him, didn't you say he just acknowledged yes, let's go? He finally said, yes, yes, he did say that. Now, what do you want me to do, gentlemen? I wasn't there so I can't paint a picture for you. I have no newspaper — no photographs of my own, because I wasn't there to take photographs. Now, these questions have to be answered by you. Now, when the jurors return, you read that testimony with reference to what I just referred to. You'll have to read that. Now, here are two questions, I can't understand this? 'Did Huertas know that he was going to aid and abet in the commission of this crime?' Do you want me to answer that, gentlemen? How could I pre-empt the jury? I'm not the jury. That's for you to determine. If you think he went there to be the protector of the Jimenez' [store owners], you say so by a verdict of not guilty. If you are satisfied beyond a reasonable doubt that he went there to take this place off, that is, to stick the place up, then you find him guilty. Now, another question: 'Can we get the pretrial given or read to us on these parts?' No. You may not, under the law. The Court Reporter, when he reads the testimony will read those questions and answers to which I have just referred. You can listen to that, and you'll have to decide, gentlemen." The jury was then sent to dinner without any testimony being reread. Before their return, defense counsel objected to the court's statement. The jury was then brought into the courtroom where it announced its guilty verdict. Although the court had charged the jury that it was the People's burden to establish that the defendant knew why Kenney was going to the store and that he went there with Kenney for the purpose of committing the robbery, when the jury sought clarification and a rehearing of some of the testimony, it received only the tirade which has been quoted. It is fundamental that a Trial Judge has a concrete duty to clarify the law upon proper jury request. A total failure to respond or an inadequate response to a legitimate query from the jury spawns serious prejudice to the defendant's rights *(People v Jackson,* 20 NY2d 440, cert den 391 US 928; *People v Miller,* 6 NY2d 152; *People v Gonzalez,* 293 NY 259). What the instant jury got in response to its request was a thinly veiled demand for conviction. What the defendant failed to get was a fair trial. Therefore, I am constrained to dissent and vote for reversal and a new trial.